IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMSC-037

Filing Date: October 22, 2012

Docket No. 32,541

STATE OF NEW MEXICO,

Plaintiff-Appellee,

v.

MARINO K. LEYBA, JR.,

Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Michael Eugene Vigil, District Judge

Aarons Law Firm, P.C.
Stephen D. Aarons
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Yvonne Marie Chicoine, Assistant Attorney General
Santa Fe, NM

for Appellee

OPINION

BOSSON, Justice

INTRODUCTION

{1}     In this first-degree murder case, the State improperly admitted into evidence a diary of the decedent which was inadmissible hearsay. Because the diary was important to the State's case, and the State repeatedly relied upon its contents throughout the trial, we conclude that the error was not harmless and the convictions must be reversed. Accordingly, we remand to the district court for a new trial.

1

**BACKGROUND**

**{2}** On May 22, 2009, Marino "Reno" Leyba (Defendant) fatally shot his pregnant girlfriend, Sarah Lovato, and her father, Bennie Lovato, after entering their apartment with a firearm. A grand jury indicted Defendant on two counts of first-degree murder, aggravated burglary, tampering with evidence, and criminal abortion. The State dismissed the criminal abortion charge without prejudice before trial.

**{3}** The State maintained that Defendant entered the Lovato apartment without permission, planning to kill Sarah. To support its theory of the case, the State introduced evidence that Defendant was increasingly violent and controlling towards Sarah, including evidence of specific acts of domestic violence against Sarah. To this end, the State introduced Sarah's diary into evidence through Sarah's sister, Julie, over Defendant's confrontation and hearsay objections. The entries in Sarah's diary described her fears about Defendant, confusion about their relationship, and an incident in which Defendant physically abused Sarah.

**{4}** Defendant's mens rea was the central point of contention at trial. While Defendant admitted that he shot Sarah and her father, he testified that he did not plan to do so and that he believed he was acting in self-defense. The jury was instructed on the full range of options for homicide, from willful and deliberate murder down to manslaughter.

**{5}** On the night in question, Defendant was working as a security officer, and he carried mace and a gun as part of his uniform. He also testified that he only entered the Lovato apartment after the door was opened for him. Defendant said that he was talking to Sarah inside the apartment when Bennie came towards him quickly, with something that looked like a gun. He thought Bennie was going to shoot him, so he sprayed Bennie with mace, getting some mace in his own eyes. Defendant testified that he feared for his life, dropped the mace, and shot his weapon a few times. At some point Sarah went into the kitchen, and Defendant fired again when he heard her coming back. According to Defendant, he never wanted, much less planned, for any of this to occur.

**{6}** Notwithstanding Defendant's trial testimony, the jury found him guilty of willful and deliberate first-degree murder of Sarah, first-degree felony murder of Bennie, aggravated burglary,[1] and tampering with evidence. Defendant appeals his convictions, arguing that Sarah's diary, as well as his booking photograph, were erroneously admitted into evidence,

---

[1] Despite our double-jeopardy precedent, the trial court failed to vacate Defendant's aggravated burglary conviction, the predicate felony for his felony-murder conviction. *See State v. Frazier*, 2007-NMSC-032, ¶ 26, 142 N.M. 120, 164 P.3d 1. This is an issue not raised by Defendant but readily conceded by the State in its answer brief. We appreciate such candor from the State.

2

which prejudiced his defense.  In addition, he argues that the jury instructions that he co-authored with the State were erroneous.

**DISCUSSION**

*The Diary–a Critical Piece of Evidence to the State's Case for Willful and Deliberate Murder*

**{7}**     The State called Sarah's younger sister, Julie, as a witness.  Julie testified that Defendant's behavior had become scary to Sarah.  She said that Defendant was not happy about Sarah's pregnancy.  At some point during Sarah's pregnancy, Julie saw her sister with bruises on her face, a fat lip, and a black eye.

**{8}**     After eliciting Julie's observations, the State attempted to introduce Sarah's entire diary into evidence.  Defendant renewed pre-trial objections to the diary, specifying that Sarah's alleged statements in her diary were inadmissible hearsay, and that their admission would violate his constitutional right to confrontation.[2]  Over objection, the court admitted the diary into evidence, and allowed Julie to read to the jury two of the three entries in their entirety.  Because the content of the diary is important to our analysis, we recite the significant entries verbatim.  The first entry was dated March 17, 2009, a little over two months before the shooting:

> on da 17[th] was da scaryest day of my life . . . cuz my boyfriend hit me cuz we were argueing so he gave me a fat lip and a black eye an a big bruzed on my check bone, an he coked me an try 2 hit my tummy but I blocked it.  I so don't know wat 2 do I still love him but Im scared 2 get bak wit him I don't want it 2 happen again . . . Im so mad an sad an confused, ugh well all write bak an let u know wat happens k bye . . [.] P[.]S.  I diden't think he would ever do dat but I geuss I was wrong.

(Ellipses in original.)  The second entry, dated March 21, 2009, stated:

> hey it's me again well Im starting 2 talk 2 Reno again, he says he thinks bout wat happend dat one day an he said hE wish hE can go bak an chang it.  or I shouldent have gone wit him 2 work I wish I never did 2, but anywho he told me he loved me an I dident say it bak, cuz I was Scared 2 but I said it I wish I dident but I still love him, bit I still don't know if I should be wit him Im scared to even see him, I think if I stay wit him Im not going 2 move in

---

[2] Defendant continues to argue that the diary violated his constitutional right to confrontation.  Because we find the hearsay argument dispositive to this appeal, we need not address whether the diary also violated the constitution, and we offer no opinion on that question.

3

wit him or marry him 4 a long time I jus don't want dat 2 happen again. he
said when he hit me he was thinking bout David and leroy an thought I was
cheating on him but he said he dident mean 2 do dat but idk wat to belive
anymore Im so confused. I wish god would give me a sine, but I know he will
help me, I want 2 go 2 Church Sunday but Im scared 2 look at him or be by
him but let's c wat happens I wanna hug him so bad tho. but Im thiking of
Seeing him next Sunday so he can realy think an stuff . . well all write bak
an let u know wat happens. K bye P[.]S. Please god help me wat 2 do Amen.

A third entry in the diary, which the State did not ask Julie to read, was entered into evidence
for the jury to examine. Dated April 8, 2009, it read:

I been haveing a bad day 4 2 day's cuz me & reno got in a fight an he says
I need 2 think if I wanna be wit him or be in da world but I wanna be wit him
so we have nt talked 2 each other 4 2 day's I miss him so much tho I feel so
alone when I don't talk 2 him. but idk im waiting 4 him 2 call me hopefuly
it will be soon k well all let u know wat happens K bye.

**{9}** Sarah's diary is an "organizer" designed for a young person—it is a small six-ring
binder, with a cartoon animal on the plastic cover, and includes a page of colorful animal and
word stickers. Its patterned and colored pages are divided into sections labeled "planner,"
"diary," "to do . . .," "notes," and "friends." Sarah's entries, described in detail above, are
handwritten in the first four pages of the "notes" section. In addition, some of the other
sections have entries, such as contact information in the "friends" section and one entry in
the "to do..." section.

*Hearsay Analysis*

**{10}** Hearsay is an out-of-court statement which is later offered in evidence to prove the
truth of the matter asserted. Rule 11-801 (C) NMRA. Under our rules of evidence, hearsay
is inadmissible unless a valid exception applies. Rule 11-802 NMRA. We review the
admission of evidence pursuant to the hearsay rule for an abuse of discretion. *State v. Largo*,
2012-NMSC-015, ¶ 22, 278 P.3d 532.

**{11}** The diary entries were obviously statements of the declarant, Sarah, made prior to
trial and later offered into evidence to prove the truth of the matter asserted: that Sarah was
afraid and Defendant was violent. The statements are inadmissible hearsay unless the State
can identify a recognized exception.

**{12}** The State argues that the diary entries dated March 17, and 21, 2009, were properly
admitted, in their entirety, under one of three exceptions to the hearsay rule: (1) the
exception for a then-existing mental, emotional, or physical condition; (2) the exception for
a present sense impression; or (3) the residual hearsay exception. In addition, the State
asserts that the March 21, 2009, statement is actually not hearsay at all because it is a

4

statement by a party opponent. The State does not identify which portions of the March 17, and 21, 2009, it believes fall under which exception to hearsay. In addition, the State does not argue that the third diary entry, April 8, 2009, is admissible under any exception. We examine each of these hearsay exceptions, and find them wanting.

### *Then-Existing Mental State*

**{13}** The exception for a then-existing mental, emotional, or physical condition applies to "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief . . ." Rule 11-803(3) NMRA. "Although [the exception] allows hearsay statements that show the declarant's then-existing mental condition, the rule does not permit evidence explaining *why* the declarant held a particular state of mind." *State v. Baca*, 120 N.M. 383, 389, 902 P.2d 65, 71 (1995) (emphasis added). The exception is limited to statements showing the mental state, not its cause.

**{14}** Sarah's March 17, 2009, diary entry includes some statements of her then-existing state of mind, such as " Im scared" and "Im so mad an sad an confused." Other statements, however, such as "my boyfriend hit me cuz we were argueing so he gave me a fat lip and a black eye an a big bruzed on my check bone," describe past events and not her present state of mind. Clearly, those statements were not admissible under this exception.

**{15}** Our concern goes deeper. Even with regard to statements expressing Sarah's mental state, "the state of mind must be relevant." *Id.* The State does not explain why Sarah's state of mind was relevant, as opposed to Defendant's state of mind. Sarah's anxiety or confusion or even her fear proves nothing without the cause of those emotions—Defendant's alleged prior acts—which are not admissible under this hearsay exception. The State seems to recognize the difference, arguing that the March 17, 2009, entry is "relevant because it provided evidence of prior violence by Defendant toward Sarah . . ." and "if true, would have changed [an expert's] opinion regarding Defendant's ability to form the deliberate intent to kill Sarah."

**{16}** In other words, the relevance pertains to Defendant's state of mind, not Sarah's, but the hearsay exception is directed at the *declarant's* state of mind, not Defendant's. Thus, under this exception the arguably relevant statements are inadmissible hearsay, and the admissible state-of-mind statements fail for lack of relevance. Either way, this particular hearsay exception is of no help to the State.

### *Present-Sense Impression*

**{17}** A present-sense impression is "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." 11-803(1) NMRA. A present-sense impression is admissible because the "substantial contemporaneity of [the]

5

event and statement negate the likelihood of deliberate or conscious misrepresentation." *State v. Flores*, 2010-NMSC-002, ¶ 51, 147 N.M. 542, 226 P.3d 641 (internal quotation marks and citation omitted). Time lapse provides an opportunity for the declarant to misrepresent or at least enhance his or her impression of the event. *Id*.

**{18}** The statements in Sarah's diary described *past* events ("my boyfriend hit me . . . we were argueing . . . he gave me a fat lip . . . he c[h]oked me . . ."), *past* feelings ("da 17th was the scaryest day of my life"), and Sarah's present *thoughts and feelings* ("I still don't know if I should be wit him Im scared 2 even see him"). The only events or conditions described in the diary entries are a fight between Sarah and Defendant and a talk between them. According to the dates in Sarah's diary, she described the fight the day it happened, March 17, 2009, and she described a talk with Defendant four days after the fight happened on March 21, 2009.

**{19}** In *Flores*, we compared an admissible statement made contemporaneously with an observation with a statement made a few hours later which was not "sufficiently contemporaneous." *See id.* ¶ 53 (citing *State v. Massengill*, 2003–NMCA–024, ¶ 10, 133 N.M. 263, 62 P.3d 354). Thus, the statements in Sarah's diary describing her reaction to events that occurred not contemporaneously but sometime before, do not "negate the likelihood of deliberate or conscious misrepresentation" by the declarant. *See Flores*, 2010-NMSC-002, ¶ 51. Those statements do not share the indicia of reliability that derive from a true *present-sense* impression. Again, this hearsay exception does not serve the State in this instance.

### *The Residual Exception*

**{20}** The residual exception may apply if a hearsay statement: (1) has particular guarantees of trustworthiness, (2) is offered as a material fact, (3) is more probative than other evidence for the point offered, and (4) serves the purposes of these rules and the interests of justice, and is not covered by another exception. Rule 11-807(A)(1)-(4) NMRA. "While . . . the rule cannot be used to supply the missing elements to admit evidence which almost, but not quite, meets the requirements of another specific exception, it can be used to admit out-of-court statements that otherwise bear indicia of trustworthiness equivalent to those other specific exceptions." *State v. Trujillo*, 2002-NMSC-005, ¶ 16, 131 N.M. 709, 42 P.3d 814. This exception is to be used sparingly, however, especially in criminal cases. *See State v. Williams*, 117 N.M. 551, 560, 874 P.2d 12, 21 (1994).

**{21}** Here, the diary almost fits into other, specific exceptions to the hearsay rule, but "not quite." Witness the State arguing three other exceptions that do not quite measure up. At trial, the State made no showing of other "indicia of trustworthiness equivalent to those other specific exceptions." The State did not attempt to show why this particular diary should be considered any more or less reliable than any other diary with the musings of a teenager. Not surprisingly, the trial court was never asked to address the specific criteria of the residual exception, and did not do so. The State has simply not laid any foundation for us

6

to give serious consideration to this exception, and we will not do so.  *See Trujillo*, 2002-NMSC-005, ¶ 16.

### Statements by a Party Opponent

**{22}**    Under Rule 11-801(D) NMRA, statements by a party opponent used against that party opponent are not considered hearsay.  Defendant is the State's party opponent; Sarah is not.  Thus, even though Defendant's statements would be non-hearsay, Sarah's statements about what Defendant allegedly said are hearsay.  Accordingly, Rule 11-801(D) also does not assist the State.

**{23}**    For all these reasons, the State's efforts to fall within one of the recognized hearsay exceptions must fail.  Sarah's statements made in her diary are clearly hearsay and should not have been admitted into evidence.  We now analyze whether this evidentiary error was merely harmless, in which case we could overlook it, or  prejudicial, requiring reversal.

### *Harmless Error*

**{24}**    Because admitting Sarah's diary was an evidentiary error, we apply the non-constitutional error standard for harmless error.  *See Tollardo*, 2012-NMSC-008, ¶ 36.  A non-constitutional error requires reversal when there is a "reasonable probability that misconduct contributed to the [defendant's] conviction."  *Id.* ¶ 31.  A constitutional error, on the other hand, requires only a reasonable *possibility* of prejudice to require reversal.  *Id.* To judge the "probable" effect of an evidentiary error, courts must evaluate all circumstances surrounding the error.  *Id.*  We examine the error itself, including the source of the error and the emphasis placed on the error at trial.  *Id.* ¶ 43.  To put the error in context, we often look at the other, non-objectionable evidence of guilt, not for a sufficiency-of-the-evidence analysis, but to evaluate what role the error played at trial.  *Id.* ¶¶ 38, 43.  As we stated in *Tollardo*, "courts may, depending upon the circumstances of the cases before them, examine the importance of the erroneously admitted evidence in the prosecution's case, as well as whether the error was cumulative or instead introduced new facts."  *Id.* ¶ 43.  (internal quotation marks and citations omitted).  This is a case-by-case examination.  *Id.* ¶ 44.

**{25}**    As explained previously, the crux of this case went to Defendant's state of mind; there was no doubt he pulled the trigger.  The jury had to decide whether his actions were willful, the result of planning and deliberation (first-degree murder), or were somehow mitigated by surrounding circumstances such as provocation or reasonable apprehension (e.g., manslaughter). Defendant was also charged with second-degree murder, an intentional shooting but without the element of deliberation, as well as felony-murder of Sarah's father.

**{26}**    This trial was all about Defendant's state of mind.  The State's theory was one of a romantic relationship gone bad, one that became increasingly violent causing escalating anxiety, until Defendant decided to end it with murder.  The State's theory depended on the

diary. The diary provided essential evidence of Defendant's violence, Sarah's apprehension, and her changing views about their future together.

**{27}** Tactically, the State used the diary as a centerpiece of its case. The diary came into evidence during Julie's testimony, the second witness to testify for the State. The State emphasized the diary's importance by having Julie read two of the three entries verbatim to the jury. Both of these entries dealt primarily with a single incident of domestic violence between Defendant and Sarah, in which Defendant, according to the diary entries, "gave [Sarah] a fat lip and a black eye and a big bruise on [her] cheekbone and he choked [her] and tried to hit [her] tummy." By having Julie read these passages aloud, the State emphasized their contents in a dramatic fashion to the jury. With admission of the entire diary into evidence, the State ensured that it would go into the jury room during deliberations, with the jury free to read it over and over.

**{28}** Defendant elected to testify at trial, and the State cross-examined him about the diary. The State asked Defendant if he had ever hit Sarah in the eye and had given her a black eye, to which he responded "[n]o, not that I recall." The State followed that question by referring to the diary, asking Defendant "[s]o when Sarah wrote about it in her diary and you were sitting right here listening to it, when she said that she was surprised that you would hit her and give her a black eye and a fat lip, was that a mistake by Sarah?" The State then rephrased the question, saying "I'm asking you if what Sarah wrote in her diary was the truth or a fabrication, or a lie?" Defendant responded: "I guess a fabrication." In addition to giving the State another opportunity to emphasize the contents of the diary, by phrasing the questions in this way and asking Defendant directly about the diary, the State was able to get Defendant to accuse Sarah, his pregnant, teenage victim, of lying. Without the diary, there would not have been a similar opportunity to do so.

**{29}** In addition to emphasizing the diary during its case-in-chief and cross-examination, the State relied on the diary during closing argument. The argument to the jury essentially began and ended with the diary. On the first full page of the transcript of the State's closing argument, the State said:

> [w]hat prompted Sarah's decision to move on with her life without [Defendant] was likely an act of domestic violence that occurred about two months earlier. It was the act that we read about in Sarah's journal, the act where [Defendant] tried to punch Sarah in the stomach, choked her, given her a black eye and a fat lip.

Later, just before the State discussed jury instructions, the State reminded the jury once again of the "[v]iolence that was documented in Sarah's journal."

**{30}** We have no doubt of the diary's prejudicial effect on Defendant. Both its placement and the repetitive manner in which the State referred to the diary during closing argument, strongly suggest how useful it was to the State. As any good trial lawyer knows, a jury is

8

most likely to remember the first and last things heard before retiring. In this case, the State made sure that the jury heard about the diary.

**{31}** Even more importantly, the evidence in this diary was somewhat unique. Although other witnesses testified about the deteriorating nature of Sarah's relationship with Defendant, the evidence of Defendant's physical violence toward her derived almost exclusively from the diary. Defendant denied it ever happened. One witness testified that she once saw Defendant pull Sarah's hair. Julie testified that she saw Sarah with the same injuries described in the diary, but it was the diary itself, and only the diary, that linked those injuries to Defendant. Besides the diary, only a single sentence uttered by Julie on cross-examination connected Sarah's injuries to Defendant. Julie stated "I was there when she got home when he beat her up." But, the State did not use this link during closing argument, relying solely on the diary. Realistically, the State's repeated and tactical use of the diary is the best evidence of its probable effect on the jury; the State knew its value and exploited the diary to full advantage.

**{32}** Other than the diary and its reference to prior violence, the State could offer only loosely circumstantial evidence to create an inference of willful deliberation. To this end, the State showed that Defendant told his mother that he was too busy with work to help with family errands and that when Defendant's father called him just prior to the time of the shooting, Defendant did not answer his phone. The State also asked the jury to draw an inference that Defendant planned to kill Sarah based on where he parked his car that evening. He parked on the street behind Sarah's home, rather than in the apartment complex in front of her apartment. But Defendant explained during his testimony that he needed a parking pass to park in front of Sarah's house and the complex had recently begun towing cars without a pass. As a result he only parked in front of the apartment when he knew he was going to remain in the vehicle.

**{33}** Without the diary, evidence of deliberation was thin in another respect. Unlike other murder cases with a shooting, the jury here could not necessarily infer willful and deliberate intent based solely on the presence of a gun. Often, a shooter must either go to a different location to get a gun or bring a gun to the location of the shooting. We have often said that similar actions by the accused can be considered evidence of willful and deliberate intent. *See State v. Lucero*, 88 N.M. 441, 443, 541 P.2d 430, 432 (1975); *State v. Taylor*, 2000-NMCA-072, ¶ 22, 129 N.M. 376, 8 P.3d 863. Here, however, Defendant, a security guard, regularly carried a gun while at work, and he was on break from work when he went to Sarah's home that night. When Defendant entered Sarah's apartment, he was in full uniform including his gun belt and holstered weapon. Obviously, Defendant's possession of the gun is still relevant. Its probative value, however, is diminished by the specific circumstances of the case which, in turn, magnify the probable effect of the diary when the jury began to consider the charge of first-degree murder.

**{34}** Examining the totality of this case, we cannot conclude under any rational view of the evidence that admission of the diary into evidence was harmless error. We cannot say

9

there is no reasonable probability that the error did not contribute to Defendant's conviction. Indeed, we find it probable that this diary did contribute, and substantially so, to Defendant's conviction for first-degree murder of Sarah.

**{35}** This does not end the inquiry, however, because Defendant was also convicted of (1) felony murder with respect to Bennie, Sarah's father, and (2) the predicate offense of aggravated burglary regarding Defendant's entry into the apartment. The State cannot escape the diary's effect with respect to these other convictions either.

**{36}** We begin with our previous conclusion that, without the diary, the State had very little evidence that Defendant killed Sarah with a willful and deliberate intent. Without such evidence, the State had little proof of aggravated burglary. The State's theory behind the aggravated burglary charge was that Defendant entered the apartment without permission intending to kill Sarah, supported of course by the incriminating evidence in the diary. Without the diary, there was little evidence of Defendant's intent at the time he entered the apartment, which is the essential element of burglary. *See* NMSA 1978, § 30-16-4 (1963) (defining the essential elements of burglary). Finally, without the predicate felony of aggravated burglary, Defendant could not be convicted of felony murder with respect to Sarah's father.

**{37}** In short, the judicial error in admitting the diary contaminates each conviction, and cannot be considered harmless with respect to any of them. Accordingly, all three convictions must be reversed, and we remand for a new trial.

### *The Booking Photo*

**{38}** At trial, Defendant introduced an expert to testify about his diminished mental capacity. While cross-examining the expert, the State presented Defendant's photograph, taken when he was booked into the county jail while wearing inmate clothing. Over defense objection, the court admitted the photograph into evidence, stating that it "presents himself." The State then asked the expert for his opinion why Defendant looked different in court than he did in his booking photograph. The expert responded that he did not know.

**{39}** Defendant now claims that the jury should not have seen the booking photo because of its prejudicial effect, likening the booking photo to presenting an accused to a jury while handcuffed and in jail clothing. The State, on the other hand, argues that Defendant's booking photo was admissible because it demonstrates Defendant's "personality," which we interpret to mean character.

**{40}** As with Sarah's diary, we review the trial court's decision to admit Defendant's booking photo for an abuse of discretion. *See State v. Garcia*, 2005-NMCA-042, ¶ 31, 137 N.M. 315, 110 P.3d 531. Evidence is relevant when: (1) it tends "to make a fact more or less probable than it would be without the evidence, and (2) the fact is of consequence in determining the action." Rule 11-401(A)-(B) NMRA. For example, a booking photograph

can help establish the identity of an accused, if identity is at issue, or it can be used to rebut other evidence regarding a defendant's appearance. *State v. Mordecai*, 83 N.M. 208, 209-10, 490 P.2d 466, 467 (Ct. App. 1971). But Defendant's identity or appearance was never at issue in the case before us.

**{41}**    Here, the State asserts that the photograph was material to Defendant's character, which the State claims was central to Defendant's defense. Assuming for the sake of discussion that evidence of Defendant's character was material, we do not understand, and the State does not explain, how Defendant's booking photograph demonstrates character, other than unfairly to make him look like a criminal. *See* Rule 11-405 NMRA (describing two methods of proving character: reputation or opinion and specific instances of conduct). If it was intended to prove that Defendant was previously arrested on the charges for which he was now standing trial, this point was obvious and not in dispute. We cannot see any legitimate reason, and the State has failed to articulate any, why the booking photo was material to any relevant issue at trial. Thus, under the facts of this particular case and in the absence of any relevant argument by the State, we conclude that the booking photo should not have been admitted into evidence and shown to the jury. We need not examine the question for harmless error, given our decision to reverse and remand on other grounds.

### Jury Instructions

**{42}**    Finally, in light of our decision to remand for a new trial, we address Defendant's arguments regarding the jury instructions. After a sidebar conference, Defendant and the State jointly offered the instructions that were eventually tendered to the jury. The trial court gave instructions on all counts and all lesser included offenses that the jury should consider for each of the respective counts. Based on expert testimony presented at trial, the court allowed the jury to be instructed on whether Defendant suffered from any mental disease or disorder at the time of the crimes, specifically whether Defendant's slow mental-processing ability made him unable to determine whether Bennie and Sarah actually posed a threat at the time of the shooting. For the first-degree murder, aggravated burglary, and tampering charges, the mental disease or disorder instruction was read as a separate instruction, after the uniform jury instruction (UJI) for each offense. However, the felony-murder instruction included within it the instruction on mental disease or disorder as element number four; it was not presented as a separate instruction after the UJI on the felony murder charge. As best as we can glean from his brief on this issue,[3] Defendant appears to argue that the mental disease or disorder instruction should have been a separate element of each offense, as it was for felony murder, and not a separate instruction.

---

[3] Defendant's briefing in this case is of very poor quality. Defendant's brief-in-chief really only raises issues, and fails to make cogent arguments as to why they constitute error, leaving it to this Court to determine why. Defendant even failed to conduct a harmless error analysis. We point this out as an example of what not to do in the future.

**{43}** We begin by reminding Defendant that "New Mexico courts have repeatedly held that the defendant cannot be heard to complain if the trial court instructed the jury as he desired." *State v. Hamilton*, 107 N.M. 186, 189, 754 P.2d 857, 860 (Ct. App. 1988) (citing *State v. Boeglin*, 105 N.M. 247, 731 P.2d 943 (1987)). However, due to the remand for a new trial, we address the issue in hope of preventing any error in the future.

**{44}** The mental disease or disorder instructions should have been included as an element of each specific intent crime. Two separate Uniform Jury Instructions embody mental disease or disorder instructions. UJI 14-5110 NMRA (inability to form a deliberate intention to take away the life of another), is given for homicide crimes while UJI 14-5111 NMRA (inability to form intent to do a further act or achieve a further consequence), is given for all other crimes which require such intent. Each of these instructions has identical language in Use Note 1 that states "[i]f this instruction is given, *add to the essential elements instruction for the offense charged* . . . ." UJI 14-5110 (emphasis added); UJI 14-5111 (emphasis added). The Use Note is clear that this instruction must be an element of the offense for which intent could be negated, as opposed to a separate instruction.

## CONCLUSION

**{45}** For the reasons stated above, we hold that the admission of the diary was harmful error and reverse Defendant's convictions for first-degree willful and deliberate murder, felony-murder, and aggravated burglary. We remand for a new trial. Defendant did not appeal his conviction for tampering with evidence.

**{46}   IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**PAUL J. KENNEDY, Justice**

**Topic Index for *State v. Leyba*, No. 32,541**

**APPEAL AND ERROR**
Fundamental Error
Harmless Error
Prejudicial Error
Remand

**CONSTITUTIONAL LAW**
Confrontation

**CRIMINAL LAW**
Burglary
Domestic Violence
Felony Murder
Homicide

**CRIMINAL PROCEDURE**
Closing Argument
New Trial

**EVIDENCE**
Hearsay
Photographs

**JURY INSTRUCTIONS**
Criminal Jury Instructions