This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-40834**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**ROBERT ALTON JONES a/k/a
ROBERT A. JONES,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LINCOLN COUNTY
Daniel A. Bryant, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Erica Schiff, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

### MEMORANDUM OPINION

**MEDINA, Judge.**

**{1}** Defendant Robert Alton Jones appeals his conviction of aggravated assault with a deadly weapon, contrary to NMSA 1978, Section 30-3-2(A) (1963). On appeal, Defendant argues the district court committed plain error by admitting lapel camera video of Victim's statements to police. Defendant claims that the video contained hearsay, irrelevant, unduly prejudicial information, and inadmissible character evidence

that the district court should have excluded regardless of defense counsel's failure to object. We reverse and remand because the admission of this video "constituted an injustice that creates grave doubts concerning the validity of the verdict." *State v. Antonio M.,* 2023-NMSC-022, ¶ 17, 536 P.3d 487 (internal quotation marks and citation omitted).[1]

## BACKGROUND

**{2}** A grand jury indictment charged Defendant with one count of aggravated assault with a deadly weapon, contrary to Section 30-3-2(A), and one count of resisting, evading or obstructing an officer (arrest), contrary to NMSA 1978, Section 30-22-1(B) (1981). During the State's opening statement, the State told the jury that its first witness, Sergeant Brawley, would testify that Victim said Defendant "pointed his .44 Magnum gun at her." The State continued, "[t]hat was after [Defendant] was drinking that particular day and pointed the gun at himself and said, "I'm going to shoot myself, and more or less, if I go, you go."

**{3}** The State called Sergeant Brawley, who testified that after responding to a domestic dispute he observed Victim standing by a vehicle in the driveway, "visibly shaken." Sergeant Brawley testified that he was wearing a lapel camera that day; that he had reviewed the lapel camera recording before trial; and that it was a true and accurate depiction of what he had witnessed. With no objection from defense counsel, the district court admitted the lapel recording as an exhibit. The State then published nearly twenty minutes of the unedited lapel recording.

**{4}** In the recording, Victim stated that she and her son drove to Los Angeles to visit with another son who happened to be on parole. Victim told Sergeant Brawley that she told Defendant she would return on Monday, which she did. Victim stated that when she returned home from the trip nothing had been done around the house and Defendant did not realize it was Monday. Victim stated that Defendant had been yelling and screaming at her all day and that Defendant was drinking "Joose"[2] which she threw in the sink because he always has alcohol around the house. With regard to the conviction in this case, Victim stated that while she was outside speaking with a dispatcher, Defendant pointed his .44 magnum at the middle of her forehead, before taking his gun to his throat and saying, "if you call the cops, it's the end of me," and that she had seen Defendant with a gun earlier in the day. Victim also said she would not stay in the house to have the gun pointed at her forehead again when she knows that it is loaded all the time.

**{5}** Victim additionally made several statements about Defendant's past behavior unrelated to the charges in this case, (1) on a prior occasion Victim had to call the police because Defendant had broken her cell phone by throwing it on the floor; (2) Defendant

---

[1]Defendant also argues (1) the district court abused its discretion by admitting improper bolstering testimony; (2) defense counsel provided ineffective assistance; and (3) Defendant suffered cumulative error. We decline to address these arguments because we reverse on other grounds.
[2]Victim described "Joose" as a 14 percent alcohol by volume drink that contains a warning label.

previously took Victim's gun and shot it into the floor right next to her head; (3) Defendant berates Victim all of the time and calls her stupid, and then uses the excuse that he had brain surgery; (4) at one point Victim went broke and lost her house as a result of Defendant drinking a thirty-pack a day; (5) Victim is really afraid of Defendant because of "that incident with the guns and shooting it in the floor and putting the big gun to [her] forehead"; and (6) that Defendant told Victim "every time, . . . you're around your queer kid, . . . you get like this."

{6}     The State called Victim as its second witness. The trial occurred more than two years after the incident, and by that time, Victim was suffering from Stage 4 lung cancer and undergoing significant treatment. Victim testified that she had lived with Defendant for approximately fifteen years and mentioned that the two of them had been in a romantic relationship that ended five years prior. Victim stated that Defendant had been by her side since her diagnosis, would take her to and from her medical appointments, and had encouraged her to receive chemotherapy and radiation treatment. In response to the State's questioning, Victim affirmed that she would not want anything "bad" to happen to Defendant.

{7}     When asked about what happened on the day leading to the charges in the case, Victim said that after she was diagnosed with cancer, she blocked out everything bad that had happened to her. The State then asked Victim if watching the lapel recording would help refresh her recollection about the events of that day—Victim did not think the video would refresh her memory, but agreed to "give it a try." The State noted that the video had already been admitted into evidence and told Victim that she would be questioned based on the footage she would see. Victim identified herself as the person portrayed in the recording. The State replayed a portion of the recording that depicted Victim saying that Defendant had broken her phone on a prior occasion, and confirming to Sergeant Brawley that Defendant had pointed a gun at her that day. Victim claimed she did not remember making that statement, but she did not think she would lie to police. Instead, Victim stated that when she gets upset, she "tend[s] to expound on things." The State pressed Victim to see whether she had lied to police on the day of the alleged assault, and she replied that she did not know and did not remember what had happened. Victim said that the recording "look[ed] like a movie to [her], it's like it's surreal."

{8}     The State then replayed another portion of the video where Victim said she did not want to be in the house with Defendant after he had pointed the gun at her forehead, and where he allegedly said, "I go, you go," as he pointed the gun at himself and then at her. In response, Victim said she did not remember making those statements to Sergeant Brawley, but that she thought she was distraught at the time because she was having trouble breathing—not because Defendant had pointed a gun at her. Victim then said that she did not think Defendant would ever hurt her.

{9}     Later during Victim's testimony, she stated that she remembered she had just returned from a great trip with her sons that day, but that was all she could recall. The State asked if the trip included one of Victim's sons that Defendant "called a bad name

for somebody who is gay." When Victim appeared puzzled, the State asked to play another portion of the recording, which defense counsel objected to on relevance grounds. The district court overruled the objection. The State then replayed a clip from the recording where Victim stated that Defendant had called her son a "queer kid." Victim did not recall Defendant calling her son a bad name.

**{10}** The State asked Victim if she'd heard of selective memory, and she had, but stated she did not believe she had a selective memory. The State continued to highlight Victim's memory issues by asking her why she remembered some details from the incident and not others. The State concluded the direct examination by reiterating that Defendant was caring for Victim and that she did not want anything bad to happen to him.

**{11}** In closing, the State continued to emphasize the distinction between what the jury saw in the lapel recording and what Victim testified to before them. The State encouraged the jury to rely on the recording to understand what happened on the day of the alleged assault. For instance, the final statement the prosecutor made to the jury was, "Today we saw selective memory-loss, selective amnesia. But what really happened that particular day, folks, there is no question. [Victim] is now the actress of the year. What you see in [the lapel recording] is true, that's what happened . . . . What you heard [Victim] say today is not true[, right]? She said nothing happened, but we know something happened." The jury convicted Defendant of aggravated assault and acquitted him of resisting arrest. Defendant appealed.

## DISCUSSION

**{12}** Defendant contends the admission and playing of the lapel recording was error. Generally, "[w]e review the admission of evidence under an abuse of discretion standard and will not reverse in the absence of a clear abuse." *State v. Sarracino*, 1998-NMSC-022, ¶ 20, 125 N.M. 511, 964 P.2d 72. However, Defendant did not object to the admission of the lapel recording and as such we review its admission for plain error.[3] *See State v. Montoya*, 2015-NMSC-010, ¶ 46, 345 P.3d 1056; *see also* Rule 11-103(E) NMRA (permitting a court to "take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved"). To find plain error, the Court "must be convinced that admission of the challenged evidence constituted an injustice that creates grave doubts concerning the validity of the verdict." *Antonio M.*, 2023-NMSC-022, ¶ 17 (alteration, internal quotation marks, and citation omitted). In determining whether plain error has occurred, we "examine the alleged errors in the

---

[3]Defendant initially argues the admission of the lapel recording violated his right to confront witnesses. "Under the Confrontation Clause, out-of-court testimonial hearsay is barred unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *State v. Cabezuela*, 2011-NMSC-041, ¶ 49, 150 N.M. 654, 265 P.3d 705 (text only) (citation omitted). The State responds that the Victim ultimately testified at trial, thereby affording Defendant the opportunity to confront her. We decline to address this argument further because we resolve the admission of the recording as an evidentiary issue rather than as a confrontation issue. *See Allen v. LeMaster,* 2012-NMSC-001, ¶ 28, 267 P.3d 806 (observing that courts should decide cases on the narrowest possible grounds and avoid reaching unnecessary constitutional issues).

context of the testimony as a whole." *Montoya*, 2015-NMSC-010, ¶ 46 (internal quotation marks and citation omitted). We apply the plain error rule "sparingly as an exception to a preservation rule designed to encourage efficiency and fairness." *State v. Garcia*, 2019-NMCA-056, ¶ 10, 450 P.3d 418.

**{13}**  Defendant argues that the video recording was inadmissible hearsay.4 *See* Rule 11-801(C) NMRA. The parties do not deny that the lapel recording contained hearsay. Rather, the State argues that the recording was admissible as a recorded recollection under Rule 11-803(5) NMRA. Rule 11-803(5) states that a recorded recollection is "[a] record that"

> (a)  is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately,
>
> (b)  was made or adopted by the witness when the matter was fresh in the witness's memory, and
>
> (c)  accurately reflects the witness's knowledge.
>
> If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party.

**{14}**  The State argues that Victim provided a foundation for the admission of the recording as a recorded recollection because she testified that she could not recall the alleged assault, acknowledged that the video was taken shortly after she called the police, and that she had never lied to the police. According to the State, "the statement would accurately reflect her knowledge of the incident at the time."

**{15}**  However, the district court admitted the video recording during Sergeant Brawley's testimony, rather than Victim's. As such, the State did not lay a foundation for the admission of Victim's hearsay statements contained in the video recording under Rule 11-803(5) at the time of its admission. Moreover, as stated above, evidence of recorded recollection admitted under Rule 11-803(5) allows a party to read the evidence into the record and may be received as an exhibit only if offered by an adverse party. Here the State did not read any of Victim's statements into the record, but instead published the lapel recording to the jury and entered it into evidence.

**{16}**  To the extent the State argues that it refreshed Victim's recollection during her testimony, we observe that by that time the recording had already been admitted into evidence. We are unaware of any way in which a witness could lay a foundation to admit evidence after it has already been published to the jury. Contrary to the State's

---

4Defendant also contests the State's use of lapel video from the following day when Defendant was arrested. However, as the State points out, the State used this recording to prove Defendant had resisted arrest. We decline to address the use of this recording because Defendant was ultimately acquitted of resisting arrest. Defendant has failed to demonstrate why the use of that video called into question "the validity of the verdict" under the plain error standard. *See Antonio M.*, 2023-NMSC-022, ¶ 17.

argument, Victim's statements in the lapel recording were not admitted in accordance with the requirements of Rule 11-803(5).

**{17}** Beyond the fact that the video recording contained inadmissible hearsay, Defendant further argues in part that portions of the recording provided the jury with unfairly prejudicial evidence in violation of Rule 11-403 NMRA, as well as inadmissible character evidence under Rule 11-404(B) NMRA. In response, the State asserts that "[t]he evidence was not inherently inadmissible under Rule 11-404(B)," and notes Rule 11-404(B) provides numerous exceptions that allow for the admission of "evidence of a crime, wrong, or other act." However, the State makes no argument about which of those exceptions might apply to Victim's statements here. Rather, the State contends that the evidence did not contain inadmissible character evidence because Victim's statements were "long" and "rambling," as indicated by her references to a trip she took with her sons, her son's sexual orientation, one of her son's status on parole, Defendant's tendency to drink, a time when Defendant broke her phone, and a time when Defendant shot a hole in the floor of her home, which the State alleges was closely entwined with the crime Defendant was charged with here. The State finally asserts that the jury "did not act solely on emotion about Defendant being a bad person," because it acquitted him of resisting arrest.

**{18}** For the reasons we explain below, we conclude the statements in the video—which included alleged instances of prior acts of aggression towards Victim and her property, alleged alcohol abuse, and other unsavory personality traits—unfairly prejudiced Defendant because they illustrated for the jury that Defendant was a bad person prone to violence and alcohol abuse, and were used to show he acted in accordance with those character traits. *See* Rule 11-403 (allowing for the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"); Rule 11-404(B)(1) (prohibiting "[e]vidence of a crime, wrong, or other act" if used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character").

**{19}** This evidence made it appear to the jury that Defendant had a propensity for substance abuse and violence and that on the day at issue in this case, he was acting in accordance with his propensity to be violent towards Victim. *See State v. Gallegos*, 2007-NMSC-007, ¶ 21, 141 N.M. 185, 152 P.3d 828 ("The nearly universal view is that other-acts evidence, although logically relevant to show that the defendant committed the crime by acting consistently with his or her past conduct, is inadmissible because the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect." (internal quotation marks and citation omitted)); *State v. Kerby*, 2005-NMCA-106, ¶ 25, 138 N.M. 232, 118 P.3d 740 ("In the case of evidence of other uncharged bad acts, unfair prejudice refers to the risk that the jury . . . will draw unfavorable inferences about the defendant's propensity for criminal conduct from evidence of non[]charged bad acts."). We do not approve of the use of such evidence.

*See State v. Ashley*, 1997-NMSC-049, ¶ 16, 124 N.M. 1, 946 P.2d 205 ("It is not proper to make the defendant appear to be an evil person before the jury." (alteration, internal quotation marks, and citation omitted)).

**{20}** Furthermore, it is clear that the State could have shown the jury only the relevant portions of the lapel recording—it only used pertinent snippets of the footage to contrast Victim's testimony on the stand with her statements to Sergeant Brawley on the day of the alleged assault. Instead, the State made the video the centerpiece of its case. For example, in the State's closing statement, the prosecutor insisted at least ten times that the jury should refer to the lapel recording if they had any doubts about what happened between Defendant and Victim. Because the prosecution relied so heavily on an improperly admitted recording, which consisted of numerous unduly prejudicial hearsay statements, we conclude that the evidence played a material role in the jury's decision to convict. As such, the evidence seriously affected the fairness of the trial and creates grave doubts concerning the validity of the verdict. *State v. Leyba*, 2012-NMSC-037, ¶¶ 27, 37, 289 P.3d 1215 (reversing a verdict in part because of the admission of hearsay statements regarding the defendant's prior act of violence towards the victim in her diary); *State v. Barraza*, 1990-NMCA-026, ¶18, 110 N.M 45, 791 P.2d 79 (noting that in determining whether there has been plain error, "we must examine the alleged errors in the context of the testimony as a whole." As such, we have grave doubts about the validity of this verdict. *See Antonio M.*, 2023-NMSC-022, ¶ 17.

## CONCLUSION

**{21}** For the foregoing reasons, we reverse and remand for proceedings consistent with this opinion.

**{22}   IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**SHAMMARA H. HENDERSON, Judge**

**MICHAEL D. BUSTAMANTE, Judge,**
**retired, Sitting by designation**