This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: June 12, 2025**

**No. S-1-SC-40273**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**ANGEL ARMENDARIZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**Angie K. Schneider, District Judge**

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Peter James O'Connor, Assistant Solicitor General
Santa Fe, NM

for Appellee

## DECISION

**BACON, Justice.**

**{1}** Defendant, Angel Armendariz, appeals directly to this Court under Rule 12-102(A) NMRA from his convictions for two counts of felony murder for the killing of a drug dealer and his accomplice during an attempted robbery, contrary to NMSA 1978, Section 30-2-1(A)(2) (1994). Defendant raises several evidentiary issues and challenges the district court's denial of his motion for a new trial.

**{2}** Defendant challenges the admission into evidence of: lay opinion testimony that several surveillance videos depicted the same two people; out-of-court statements made by Johnathan Stewart, who is also charged in connection with these murders and was an unavailable witness; and text messages exchanged between Stewart and one of the victims on the night of the murders. We affirm Defendant's convictions because the admission of this evidence was not erroneous, or if erroneous, harmless, and because the district court correctly denied Defendant's motion for a new trial. We resolve this case by non-precedential decision as the issues raised are sufficiently addressed by New Mexico precedent. *See* Rule 12-405(B)(1) NMRA.

## I.    BACKGROUND

**{3}** On November 2, 2014, a drug dealer, Jonathan Garnand (victim Garnand), and his accomplice, Devone Blake, were shot with one bullet each to the back of the head while sitting in the front seat of victim Garnand's car. Both eventually died from the wounds.

**{4}** The State charged Defendant with two counts of first-degree murder under alternative theories of felony murder and willful and deliberate murder. It joined Stewart as co-defendant, but, upon motion by Defendant and stipulation between Defendant and the State, the district court later severed the cases. Stewart was declared an unavailable witness in Defendant's trial pursuant to Rule 11-804 NMRA by stipulation of the parties and upon order of the district court.

**{5}** The State filed motions in limine or otherwise argued pre-trial to admit statements made by Stewart to his then-girlfriend, Aliesha Armendariz, just after the murders;[1] statements made by Stewart to a jailhouse informant, Erik Myles; and text messages between Stewart and victim Garnand. A hearing was held on these evidentiary issues. The district court admitted the aforementioned evidence over opposition by Defendant.

**{6}** At trial, Ms. Armendariz testified, in essence, that on the day of the murders or the next day she asked Stewart whether he shot the victims. He said he did, that he was with Defendant, and that he and Defendant each shot one of the victims. Myles testified that Stewart told him Defendant fired first and that they then went back to the house where they were both staying.

**{7}** The State introduced two surveillance videos from a home surveillance camera on the street where the murders took place and still images from those surveillance videos. One of the videos was from approximately 10:12-16 p.m. on the night of the murders, and the other was from approximately 11:13 p.m. the same night. The State also introduced a surveillance video from a camera at a bank nearby at a few minutes past 10:00 p.m. that night.

**{8}** Defendant admitted in his testimony that he was at a meeting with Stewart, the two victims, and others, that took place a little after 10:00 p.m. He also admitted he was

---

[1]Aliesha Armendariz was Aliesha Beavers at the time Stewart made the statements to her about the murders. She later married Defendant. We refer to her by her married name throughout this decision.

in both the home surveillance video and the bank video from that approximate time. But he denied he was at the later meeting on the same street, during which the victims were murdered. He testified that he was asleep.

**{9}** The State introduced lay testimony from a detective who stated that she could not identify Defendant in the videos or discern faces, but, in her opinion, the two people shown in the earlier videos (both of which Defendant admitted he was in) are the same people that are in the later video (which Defendant denied being in). She stated she studied the videos, watched them a number of times, and watched the later home surveillance video "dozens, if not hundreds of times, slowed it down frame by frame, . . . looking at each different camera angle multiple times on different size screens or monitors." She also viewed "larger single frames" from the videos. She based her opinions on the "physical features or general height comparison, plus clothing, [and] shoe wear."

**{10}** Although the guns were never recovered, two bullet casings were recovered from the car. A firearm expert identified the casings as a 9 x 18 Makarov caliber made by Hornady and a .45 auto caliber made by Federal. The expert testified that the two casings were fired from two different guns. She also testified that the .45 casing matched .45 casings found at an open field shooting range; i.e., the casing found in the car and the casings from the shooting range were fired from the same gun. There was testimony that Defendant and Stewart, along with others from the house where they were staying, visited this shooting range to fire guns before the murders. Moreover, there were two guns known to be in the house where Defendant and Stewart were staying—a 9-millimeter and a .45 caliber—that went missing about a month before the murders. There was testimony that Stewart, along with Defendant, offered to sell two guns around this time. There was testimony that Defendant participated in a conversation in which Stewart discussed robbing the two victims on a trip to Clovis, and Stewart asked for victim Garnand's address in order, according to the witness, to rob him.

**{11}** The jury convicted Defendant of two counts of felony murder, contrary to Section 30-2-1(A)(2), and the district court sentenced him to two terms of life imprisonment to run consecutively. Defendant filed a motion for a new trial based on newly discovered evidence, which was denied.

## II.    DISCUSSION

**{12}** We begin by discussing relevant legal background, and then discuss Defendant's challenges, providing additional legal background as necessary.

## A.    Standard of Review

**{13}** The admission of evidence is reviewed for abuse of discretion. *State v. Veleta*, 2023-NMSC-024, ¶ 5, 538 P.3d 51; *see also State v. Torres*, 1998-NMSC-052, ¶ 15, 126 N.M. 477, 971 P.2d 1267 (confirming the same standard of review applies to the admission of statements against penal interest under Rule 11-804(B)(3)), *overruled on*

*other grounds by State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 23, 136 N.M. 309, 98 P.3d 699. "An abuse of discretion occurs when the court exceeds the bounds of reason, all the circumstances before it being considered." *State v. Anderson*, 2023-NMSC-019, ¶ 34, 536 P.3d 453 (internal quotation marks and citation omitted); *see also State v. Fernandez*, 2023-NMSC-005, ¶ 8, 528 P.3d 621 ("An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case."). "An evidentiary ruling within the discretion of the court will constitute reversible error only upon a showing of an abuse of discretion and a demonstration that the error was prejudicial rather than harmless." *State v. Smith*, 2016-NMSC-007, ¶ 46, 367 P.3d 420 (internal quotation marks and citation omitted).

**B.    The District Court Did Not Abuse Its Discretion by Admitting Lay Opinion Testimony That Three Surveillance Videos Depicted the Same Two People**

**{14}**    Over objection, the district court allowed Detective Fernandez to offer lay opinion testimony about surveillance video recovered from a house adjacent to the crime scene and from a bank nearby. Surveillance video from the house was presented at trial in the form of two video exhibits and stills from the two videos. The first house surveillance video showed the earlier of the two meetings at issue and the second video recorded the later meeting during which the victims were shot. Detective Fernandez testified "in [her] opinion it is the same individuals in" the earlier and the later videos. She stated that she studied the videos and watched them a number of times. With regard to the later video, Detective Fernandez stated that she "watched it dozens, if not hundreds of times, slowed it down frame by frame, . . . looking at each different camera angle multiple times on different size screens or monitors." She also viewed "larger single frames" from the videos.

**{15}**    Detective Fernandez also offered her opinion that the individuals in the bank video are the same people in the surveillance videos from the house near the crime scene. She based all of the opinions discussed above not on the faces on the videos—which could not be discerned—but on the "physical features or general height comparison, plus clothing, [and] shoe wear."

**1.    Relevant law**

**{16}**    Rule 11-701 NMRA governs opinion testimony by lay witnesses, and provides, in relevant part, that non-expert "testimony in the form of an opinion is limited to one that is . . . helpful . . . to determining a fact in issue." Rule 11-701(B). Authenticated surveillance video has been traditionally admitted into evidence under the silent witness theory, and such a video speaks for itself to the jury. *State v. Sweat*, 2017-NMCA-069, ¶ 21, 404 P.3d 20. However, courts have been more frequently allowing lay witnesses to provide opinions regarding the identity of persons in surveillance videos. *See id.* ¶ 22 (discussing how the Illinois Supreme Court permits the use of lay opinion video identification testimony and adopting the same approach for New Mexico); *see also* George Bach, *Moderating the Use of Lay Opinion Identification Testimony Related to Surveillance Video*, 47 Fla. St. U. L. Rev. 445-47 (2020) (discussing the "increasing frequency" in which courts are permitting lay opinion video identification testimony and

that it "is offered . . . particularly in cases where the video is of poor quality, the subject's face is difficult to see, or the subject's appearance has changed by the time of trial.").

**{17}** In *Sweat*, our Court of Appeals adopted an approach to the admissibility of lay opinion video identification testimony from an Illinois Supreme Court case, *People v. Thompson*, 2016 IL 118667, 49 N.E.3d 393. 2017-NMCA-069, ¶ 22. Following *Thompson*, the *Sweat* Court concluded that lay opinion identification testimony is helpful to the jury's determination "of whether the individual depicted in a surveillance recording is the defendant"—and is therefore admissible—where "there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." 2017-NMCA-069, ¶ 22 (quoting *Thompson*, 2016 IL 118667, ¶ 41).

**{18}** *Sweat* adopted the five *Thompson* factors relevant to determining whether a lay witness is more likely than the jury to make a correct identification:

> (1) the witness's general level of familiarity with the defendant's appearance; (2) the witness's familiarity with the defendant's appearance at the time the surveillance photograph was taken or whether the defendant was dressed in a manner similar to the individual depicted; (3) whether the defendant disguised his [or her] appearance at the time of the offense; (4) whether the defendant had altered his [or her] appearance prior to trial; and (5) the degree of clarity of the surveillance recording and the quality and completeness of the subject's depiction in the recording.

*Id.* (internal quotation marks and citation omitted). Any one of these factors alone "indicates that there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *Id.* (internal quotation marks, brackets, and citation omitted).

## 2. Analysis

**{19}** In his challenge to the detective's testimony, Defendant addresses *Sweat*, *State v. Chavez*, 2022-NMCA-007, 504 P.3d 541, and *State v. Stalter*, 2023-NMCA-054, 543 P.3d 989, each of which addresses the admissibility of lay opinion identification testimony. Defendant's basic argument is that this case is more like *Chavez* than *Stalter*, and indeed it is. As Defendant argues, *Stalter* is clearly unlike this case because the testifying lay witness in that case was familiar with the disguised defendant, and therefore the first and third factors of the *Sweat/Thompson* test were met. *See Stalter*, 2023-NMCA-054, ¶ 31 (concluding that the district court did not abuse its discretion by admitting lay identification testimony because the witness had daily contact with the defendant at work for about two years and the defendant conceded that he was disguised in the relevant video footage). Nevertheless, *Chavez* is also quite different from the instant case. In *Chavez*, the Court of Appeals concluded that it was an abuse of the district court's discretion to allow a law enforcement officer to testify that surveillance video showed that the defendant "[drew] a gun" and that a dark object in defendant's hand could have been only "one thing[,]" *i.e.*, a gun. *Chavez*, 2022-NMCA-

007, ¶¶ 40, 43 (internal quotation marks omitted). The testifying officer in *Chavez* did not perform an extensive review of the video, study enlarged stills, or slow the video down frame by frame, as did Detective Fernandez in this case. Also different is that the *Chavez* Court did not explicitly discuss whether the video at issue was unclear. Therefore, contrary to Defendant's contention, *Chavez* does not control the result in this case.

**{20}** In fact, although the *Chavez* Court notes the five-factor test from *Sweat*, it does not apply the factors or even list them. *Id.* ¶¶ 41-43. Instead, the *Chavez* Court concluded that the officer's "testimony was unhelpful to the fact-finder because there is no basis for concluding that [the officer] was more likely than the jury to correctly determine whether the video shows [the defendant] holding a handgun," without specific reference to the *Sweat/Thompson* factors. *Id.* ¶ 42. Because the officer in *Chavez* did not perform the additional study of the video in that case that Detective Fernandez did in the instant case, and because the *Chavez* Court did not engage with the *Sweat/Thompson* factors, we conclude that *Chavez* is ultimately unhelpful to Defendant.

**{21}** This case is less like *Chavez* or *Stalter* than *State v. Gwynne*, 2018-NMCA-033, 417 P.3d 1157. In *Gwynne*, a law enforcement officer described a "consistent abnormality to the abdomen, . . . some sort of scar or possibly a tattoo" seen in three videos. *Id.* ¶¶ 3, 7. He looked at stills from the videos and watched the videos again, then compared the video evidence to photographs taken of Defendant's torso. *Id.* ¶¶ 3, 7, 28. He testified that the photographs of the defendant depicted a "vertical scar" that was similar to what he saw on the videos and concluded that Defendant was the male participant in the video. *Id.* ¶ 28. The videos in *Gwynne* were "dark and grainy" and the defendant stated that the "scarring or other details in the video are *not* clear . . . when viewed on a video monitor." *Id.* ¶ 33 (internal quotation marks omitted). The *Gwynne* Court noted that this satisfied the fifth *Sweat* factor and concluded the law enforcement officer's "testimony was admissible under Rule 11-701 because it would have been helpful . . . to determining a fact in issue[,] i.e., the identity of the male participant in the videos." *Id.* ¶ 33 (alteration in original) (internal quotation marks omitted and citation omitted). In *Gwynne*, as in the instant case, there was unclear video and other visual evidence that the law enforcement officer studied, compared, and, based on those informed comparisons, drew identification conclusions which the district court determined were admissible under Rule 11-701.

**{22}** The analysis in the instant case is fundamentally similar to *Gwynne*. The applicable test from *Sweat* provides that meeting one factor without more can support the admission of lay witness video identification testimony. Defendant stated repeatedly in the district court that the video was unclear. The unclear video implicates the fifth *Sweat/Thompson* factor. *See Sweat*, 2017-NMCA-069, ¶ 22 (stating that the "the degree of clarity of the surveillance recording and the quality and completeness of the subject's depiction in the recording" is relevant to determining whether a lay witness is more likely than the jury to make a correct identification (internal quotation marks and citation omitted)). And the district court found that Detective Fernandez's study of the visual evidence, including viewing the video evidence frame-by-frame, provided something to the jury that "the jury [didn't] have the ability to do." For these reasons, the

district court's decision to admit Detective Fernandez's testimony did "not exceed[] the bounds of reason, all the circumstances before it being considered" and therefore was not an abuse of the court's discretion. *Anderson*, 2023-NMSC-019, ¶ 34.

## C. The District Court Did Not Abuse Its Discretion by Admitting Out-Of- Court Statements From Co-Defendant Stewart

**{23}** Defendant argues that the district court abused its discretion by admitting out-of-court statements by Stewart, an unavailable witness[2] pursuant to the hearsay exception for statements against penal interest, Rule 11-804(B)(3). Stewart's hearsay statements were admitted through the testimony of a jailhouse informant, Erik Myles, and the testimony of Aliesha Armendariz, who was Stewart's girlfriend at the time of the killings, but married to Defendant by the time of trial.

**{24}** Hearsay "[m]eans a statement that (1) the declarant does not make while testifying at the current trial or hearing, and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Rule 11-801(C) NMRA. Hearsay is generally inadmissible. Rule 11-802 NMRA. However, Rule 11-804(B)(3) provides an exception to the general rule where a statement was made by an unavailable witness. Two requirements must be met:

> (a) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability, and
>
> (b) [the statement] is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

*State v. Martinez*, 2021-NMSC-002, ¶ 108, 478 P.3d 880 (quoting Rule 11-804(B)(3)). This is sometimes known as the hearsay exception for statements against penal interest. *See, e.g.*, *State v. Torres*, 1998-NMSC-052, ¶¶ 15-16.

### 1. Rule 11-804(B)(3)(a)'s contrary to penal interest requirement

**{25}** *Torres* provides the test for whether a statement is contrary to penal interest for the purpose of Rule 11-804(B)(3)(b). *Torres*, 1998-NMSC-052, ¶¶ 11, 14-15. Although federal law does not control this Court's interpretation of Rule 11-804(B)(3), *Torres* adopted the framework from *Williamson v. United States*, 512 U.S. 594 (1994). *Id.* ¶ 13. We therefore turn to *Williamson* as construed in *Torres*.

---

[2]The district court issued an order finding that Stewart was an unavailable witness under Rule 11-804(A) NMRA, in accordance with the stipulation of the parties.

**{26}** The statements against penal interest analysis is a "fact intensive inquiry that can only be answered in light of all the surrounding circumstances." *Torres*, 1998-NMSC-052, ¶ 15 (internal quotation marks omitted) (citing *Williamson*, 512 U.S. at 604). The "determinative inquiry" is "whether the statement is so far contrary to the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *Id.* ¶ 14 (internal quotation marks omitted) (citing Rule 11-804(B)(3) and *Williamson*, 512 U.S. 594). "[T]he reliability of declarations against interest is best secured by a statement-by-statement analysis of the declarant's narrative." *Id.* (agreeing with *Williamson*). A "statement" is not "an extended narrative but, instead, a single declaration." *Id.* ¶ 11 (internal quotation marks omitted).

**{27}** Non-self-inculpatory statements are not admissible, even when "made within a broader narrative that is generally self-inculpatory." *Id.* (internal quotation marks omitted) (citing *Williamson*, 512 U.S. at 600-01). Yet, it is not necessary to dissect narratives containing statements against penal interest such that the narrative loses all context. *Id.* ¶ 14 ("[W]e believe that *Williamson* does not stand for the proposition that all narratives containing statements against penal interest must be dissected in such a way that they lose any contextual meaning."). "[F]acially-neutral but contextually-incriminating details may be admitted if a reasonable person in the declarant's position would not have revealed them unless believing them to be true due to their strong tendency to subject the declarant to criminal liability." *Id.* (referencing *Williamson*). "[P]lainly self-inculpatory remarks need not be introduced in the absence of necessary context." *Id.* (referencing *Williamson*).

## 2. Rule 11-804(B)(3)(b)'s corroborating circumstances to indicate trustworthiness requirement

**{28}** *State v. Urias* provides the framework to assess the corroborating circumstances that indicate the trustworthiness of a statement against interest, required pursuant to Rule 11-804 (B)(3)(b). 1999-NMCA-042, ¶ 7, 127 N.M. 75, 976 P.2d 1027. *Urias* provides six factors for courts to consider when determining whether there were corroborating circumstances:

> (1) whether the declarant had at the time of making the statement pled guilty or was still exposed to prosecution for making the statement, (2) the declarant's motive in making the statement and whether there was a reason for the declarant to lie, (3) whether the declarant repeated the statement and did so consistently, (4) the party or parties to whom the statement was made, (5) the relationship of the declarant with the accused, and (6) the nature and strength of independent evidence relevant to the conduct in question.

*Id.*; *see also Martinez*, 2021-NMSC-002, ¶ 109.

### 3. Stewart's statement to Erik Myles was properly admitted under Rule 11-804(B)(3)

**{29}** Defendant challenges the admission of the statement at trial that Defendant shot first:

> [Prosecutor]: Did you tell law enforcement that [Stewart] said that [Defendant] fired first?
>
> [Myles]: Yeah, I said that. Yeah, I said that.
>
> [Prosecutor]: And then they went back to the house?
>
> [Myles]: Yes.

Defendant argues that this was not a statement against penal interest because it attempted to shift blame onto Defendant and is not sufficiently against Stewart's penal interest to be admissible under the statement against penal interest hearsay exception.[3]

**{30}** Defendant relies on *People v. Gallardo*, 18 Cal. App. 5th 51, 226 Cal. Rptr. 3d 669 (2017), arguing that *Gallardo* is similar. We conclude that *Gallardo* is quite different. In *Gallardo*, the trial court admitted a full forty-page transcript of "a surreptitiously-recorded jailhouse conversation between [co-defendant and declarant] Angel Gallardo and two paid informants who were posing as inmates." *Id.* at 55, 72. And although Gallardo "effectively admit[ted] some complicity" in this murder case "by demonstrating [that he] had knowledge of what had occurred[,]" his "statements nonetheless placed the major responsibility on his codefendants" by identifying others as the shooter and the driver of the car from which the shots were fired. *Id.* at 74 (internal quotation marks, brackets, and citation omitted). In light of the defendant's prior admissions, the *Gallardo* court concluded that the statements at issue "did little to increase [declarant's] criminal culpability, and served primarily to minimize his role and place the blame . . . on his accomplices." *Id.* (internal quotation marks, brackets, and citation omitted).

**{31}** The instant case is more like *Torres* than *Gallardo*. In *Torres*, among the recorded statements the declarant made to police were that he fired a shotgun and that the defendant fired a 9mm gun:

> [The defendant] and [the declarant] got out of the car, with [the declarant] going around the back and [the defendant] exiting the driver's side, which faced the party. [The declarant] told the police that he had a shotgun . . . and that he fired the shotgun one time into a crowd of about fifteen or twenty people outside at the party. He also told the police that [the defendant] yelled, "Westside," and then fired a nine millimeter several

---

3We note that there is a potential double hearsay issue with Myles's quoted testimony because he testified about *his statements* to law enforcement as to what Stewart told him. However, Defendant has not raised this issue and therefore we analyze it no further.

times into the crowd. Finally, he told police that he did not learn that someone had been hit by the gunshots until hearing it on the news that night or the next day.

1998-NMSC-052, ¶¶ 5-6. The defendant argued that this either was self-exculpatory or collateral to the declarant's self-inculpatory remarks because more bullets were fired from the 9mm gun than the shotgun and because the fatal bullet was that caliber. *Id.* ¶¶ 8, 16.

**{32}** This Court held that that the district court did not abuse its discretion to admit the declarant's statements under Rule 11-804(B)(3). *Id.* ¶ 19. It concluded that because the declarant stated, among other things, "that he and [the defendant] fired into the crowd in unison[,]" he exposed himself to significant criminal liability including a charge of depraved mind murder. *Id.* ¶ 17. Accordingly, the *Torres* Court concluded, "that reasonable persons in the declarant's position would not have subjected themselves to such severe criminal liability unless believing each of the statements to be true." *Id.* ¶ 19.

**{33}** Here, Stewart's statement that Defendant fired "first" is an implied admission that Stewart fired. Similar to *Torres*, this statement clearly exposes Stewart to "severe criminal liability"—i.e., at least one murder charge—while also implicating Defendant. Although "subjective beliefs are relevant in evaluating reliability and admissibility under Rule 11-804(B)(3)," there is no indication in the record that Stewart believed that he was foisting all of the serious criminal exposure onto Defendant by stating that Defendant fired the first shot. *Id.* ¶ 18. Instead, this statement implies Stewart and Defendant both fired "in light of all the surrounding circumstances." *Id.* ¶ 15. Surrounding circumstances, which would have been known to Stewart at the time this statement was made, include: that two guns were used in the murders—a .45-caliber gun and a 9mm gun; that each victim had suffered a single gunshot wound to the head; and that shortly after the murders, Stewart stated he was involved. Accordingly, under both the facts and law from *Torres*, the district court did not abuse its discretion by concluding that Stewart's statement was sufficiently contrary to his penal interest to be admitted under Rule 11-804(B)(3).

**{34}** Defendant further argues that the district court abused its discretion in admitting Stewart's statement because the corroborating circumstances did not indicate the trustworthiness of the statement as required under Rule 11-804(B)(3)(b) and the *Urias* factors. Defendant offers a short argument challenging the *Urias* factors: Stewart was still exposed to prosecution (*Urias* factor (1)) and had reason to shift blame to Defendant (factor (2)). The statement was apparently made twice (factor (3)), and was made to a fellow inmate, Myles, which does not necessarily indicate a relationship of trust and confidence (factor (4)). Although Stewart and Defendant were roommates and shared mutual friends, they were also dating the same woman (factor (5)). Also, Defendant argues that the independent evidence against him was weak (factor (6)).

**{35}** We disagree with Defendant's analysis. Importantly, Stewart did not shift blame in any meaningful sense by stating that Defendant fired first; instead, Stewart's

statement exposed him to significant liability. Therefore, this was not a lie that a reasonable person who was exposed to prosecution would tell. Thus, *Urias* factors (1) and (2) are corroborative. Although it is not clear if Myles repeated the statement that Defendant fired first, even if he did, repeating the inculpatory statement does not indicate a lack of trustworthiness, and is arguably corroborative (factor (3)). We agree with Defendant that Myles, as a jailhouse informant, is not necessarily a trusted confidant (factor (4)), but nor is there much reason for Stewart to make a false statement to him, particularly a false statement that admits liability for murder (factors (4) and (5)). *Cf. Torres*, 1998-NMSC-052, ¶ 18 (noting that self-inculpatory remarks are potentially unreliable when made to authorities to gain favor). The evidence against Defendant was circumstantial but not weak, when all evidence is considered (factor (6)).

**{36}**    For the reasons stated, we conclude that the district court's admission of Stewart's statement that Defendant shot first, offered through the testimony of Myles, was not an abuse of the district court's discretion. *See Anderson*, 2023-NMSC-019, ¶ 34. Accordingly, we reject Defendant's argument on this issue.

## 4.    Stewart's statement to Aliesha Armendariz was properly admitted under Rule 11-804(B)(3)

**{37}**    Defendant challenges the admission of statements by Stewart offered through the testimony of Ms. Armendariz, characterized by Defendant thus: "[Ms. Armendariz] asked Mr. Stewart if he did it and he said he did. He said he was with [Defendant]. Mr. Stewart told her that it was him and [Defendant] and that Mr. Stewart shot [victim] Garnand." The relevant testimony is as follows:

| | |
|---|---|
| [Prosecutor]: | Did you hear about the Homicide that happened in Alamogordo in November of 2014? |
| [Ms. Armendariz]: | Yes, I did. |
| [Prosecutor]: | After you learned about it, did you have any conversations with . . . Stewart? |
| [Ms. Armendariz]: | I did. |
| . . . | |
| [Prosecutor]: | And how long after are we talking about? |
| [Ms. Armendariz]: | The same day I think, if not, the day after. |
| [Prosecutor]: | And during those conversations did he make any statements to you about what happened? |
| [Ms. Armendariz]: | Yes, he did. |

| [Prosecutor]: | What did he tell you? |
| [Ms. Armendariz]: | I just asked if he did it, and he said he did. |
| [Prosecutor]: | Did he also name anybody else? |
| [Ms. Armendariz]: | He did. He said he was with my husband [i.e., Defendant]. |
| . . . | |
| [Prosecutor]: | Can you tell us what he said about it when he told you he did it? How did he say it? |
| [Ms. Armendariz]: | I just asked if he did it and he said he did. He said that it was him and [Defendant], and that I -- *he said it was him and [Defendant], and that he shot -- he was the one who shot [victim Garnand].* |
| [Prosecutor]: | Did he give you any more details about what happened to them? |
| [Ms. Armendariz]: | He did. *He told me that my husband [i.e., Defendant] is the one who did it for [victim] Blake; I've never heard that from my husband.* |

The analysis of Ms. Armendariz's testimony is not materially different from the analysis of Myles's testimony. Again, under *Torres*, it was not an abuse of discretion to admit Stewart's statements where those statements exposed him to severe criminal liability—for murder—and did not shift blame, while also implicating Defendant. *See Torres*, 1998-NMSC-052, ¶¶ 6, 17, 19 (holding that it was not an abuse of discretion to admit declarant's statements under Rule 11-804(B)(3), where the declarant stated in a murder case that the defendant fired a 9mm gun but also exposed himself to severe criminal liability by stating that he fired a shotgun).

**{38}**   Defendant's *Urias* corroboration argument is also almost identical to his corresponding argument for the testimony of Myles, thus the analysis is similar. The only material difference is that Ms. Armendariz was, at the time of the statement, the girlfriend of the declarant (factor (5)). By type, this is a stronger and more trusting relationship than a relationship with a fellow inmate. To the extent that there were complications in this relationship—there is evidence that Ms. Armendariz was already sexually involved with Defendant—this makes it less likely that Stewart would choose to tell her an inculpatory untruth. We conclude that the district court did not commit error based on the *Urias* analysis.

**{39}**   For the reasons stated, the district court's admission of Stewart's statements described above, offered through the testimony of Ms. Armendariz, was not an abuse of

the district court's discretion. Accordingly, we reject Defendant's argument on this issue. *See Anderson*, 2023-NMSC-019, ¶ 34.

**5.     Ms. Armendariz's testimony that she had falsely stated that Defendant implicated himself because she was mad at him is not reversible error, even if it was inadmissible**

**{40}**   Defendant contends that Mrs. Armendariz's "testimony that she falsely told [victim Garnand's mother] that [Defendant] had told her about his involvement was plainly inadmissible." The testimony is as follows:

| [Prosecutor]: | Did you have a phone conversation with [victim Garnand's mother] in July of 2015? |
|---|---|
| [Ms. Armendariz]: | I did. |
| [Prosecutor]: | What did you tell her? |
| [Ms. Armendariz]: | I basically told her everything [Stewart] told me, but I put it off on [Defendant] because I was mad at [Defendant] for going back to Oklahoma and being with somebody other than me. |
| [Prosecutor]: | Okay. So in July 2015 were you and the Defendant together? |
| [Ms. Armendariz]: | After -- yes, we were I think. |
| [Prosecutor]: | Were you in a relationship? |
| [Ms. Armendariz]: | Was I in a relationship? |
| [Prosecutor]: | Yes. |
| [Ms. Armendariz]: | No. |
| [Prosecutor]: | Were you still in a relationship with [Stewart] at that time? |
| [Ms. Armendariz]: | Yes, I was. |
| [Prosecutor]: | So did you tell [victim Garnand's mother] or did you give her a statement about [Defendant] saying that they were both involved? |
| [Ms. Armendariz]: | I did tell her that. I did tell her that, but it was a lie. I only heard anything from [Stewart] and I did put it off |

on [Defendant] because I was hurt by him, but it never came from him.

[Prosecutor]: So at that time you were in a relationship with [Stewart], but you weren't with the Defendant?

[Ms. Armendariz]: No, I wasn't, but [Defendant] was my first -- [Defendant] was my first love, so it hurt me for him to go back and be with somebody else, and I did put it off on him what [Stewart] told me.

**{41}** Defendant argues only "Ms. Armendariz admitted it was not something she heard [Defendant] say and so was not his statement against interest or a statement of a party opponent since she testified he never said it. It was simply inadmissible." The State does not address the admission of these statements.

**{42}** We conclude that any error in the admission of this evidence was harmless. As constitutional error is not raised on appeal, at issue in this case is the standard for non-constitutional error, which is harmless unless there is a "reasonable probability that [the] misconduct contributed to the defendant's conviction." *State v. Leyba*, 2012-NMSC-037, ¶ 24, 289 P.3d 1215 (internal quotation marks, citation, and original alteration omitted). More specifically, it is evidentiary error that is at issue, which requires "a case-by-case examination" where "courts . . . evaluate all circumstances surrounding the error." *Id.* ¶ 24; *see also State v. Tollardo*, 2012-NMSC-008, ¶ 44, 275 P.3d 110 ("When assessing two cases that are factually analogous, with similar errors, the reviewing court thus may find the impact of the error harmful in one case and harmless in the other.").

**{43}** "To judge the 'probable' effect of an evidentiary error," courts examine the following factors: "the error itself, including the source of the error and the emphasis placed on the error at trial"; for context, "the other, non-objectionable evidence of guilt, not for a sufficiency-of-the-evidence analysis, but to evaluate what role the error played at trial"; and "the importance of the erroneously admitted evidence in the prosecution's case, as well as whether the error was cumulative or instead introduced new facts." *Leyba*, 2012-NMSC-037, ¶ 24. If an error is harmless, it does not require reversal. *See id.*

**{44}** There is no reasonable probability that this testimony contributed to Defendant's convictions, and therefore the error is not reversible. *Leyba*, 2012-NMSC-037, ¶ 24. Defendant does not argue that it was emphasized at trial, nor do we perceive that it was. *Id.* (stating that courts examine whether the erroneous evidence was emphasized at trial when performing harmless error analysis). Importantly, the information that is damaging to Defendant—his involvement in the shooting—was cumulative. *Id.* (stating that courts examine whether the error was cumulative or introduced new facts when performing harmless error analysis). Moreover, this testimony would seem to undermine the credibility of Ms. Armendariz as a witness, and thus perhaps dull the impact of her testimony relating to Stewart's statement that Defendant shot one of the victims. *Id.* (stating that courts examine whether the error was important, i.e., helped the

prosecutor's case, when performing harmless error analysis). We reject Defendant's argument on this point because, even assuming admission of this testimony was erroneous, the admission of it was harmless and is not reversible error.

**D.      The District Court Did Not Err in Admitting All of the Text Messages Between Victim Garnand and Stewart**

**{45}**    Defendant argues that it was an abuse of discretion to admit "all" of the numerous text messages between Stewart and victim Garnand but focuses his argument on just one text message exchange that occurred prior to the second, fateful, meeting. The text message exchange is as follows:

| | |
|---|---|
| Victim Garnand: | Who's your boy |
| Stewart: | The [guy][4] that was just with me |
| Victim Garnand: | Yeah |
| Stewart: | He a homie from back home and you already or we going to get it |
| Victim Garnand: | Can your boy stat [sic] behind; no new [sic] faces |
| Stewart: | He wanted to get that oz you had on you |

Defendant argues that this exchange in particular was hearsay and that no hearsay exception applies.

**{46}**    The crux of this exchange was used by the State both in closing argument and in its rebuttal to Defendant's closing argument. In closing, it was used by the State as follows: "[victim Garnand] references 'Who's the [guy]?' The response to that was 'The same guy that you just saw at the first meeting; he's coming with me' which is identification of the Defendant." In rebuttal, it was used as follows: "[victim Garnand] is asking [Stewart], 'Who else are you bringing?' And Stewart says, 'The same guy that was with me the first time.' Who was that? The Defendant. Two people went to the first meeting; [two] people went to the second meeting." Defendant argues that "[t]he specific text message identifying [Defendant] as the person with Stewart at 10:55 p.m. in response to [victim] Garnand's question was an out-of-court statement offered for the truth of the matter asserted[.]"

**{47}**    We conclude that the text message exchange at issue was not hearsay because, contrary to Defendant's contention, the statement was not used by the State for the truth of the matter asserted. Moreover, even assuming it was hearsay, the error was harmless. We explain.

---

4The original text message uses a racial epithet. We substitute "[guy]" for the epithet.

**{48}** The specific assertion in the first two texts—that the unidentified person with Stewart at the time the text was sent (10:55 p.m.) was also with him earlier—was not used by the State to prove that point but instead as inferential support for the point that Defendant was with Stewart a bit later, at the second meeting when the victims were shot, and to contradict Defendant's claim that he was home asleep during the killings. These latter points are not the truth of the matter asserted in the text message. *See* Rule 11-801(C)(2) (stating that hearsay "[m]eans [an out-of-court] statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement.").

**{49}** In any event, if there was error from the admission of this text message exchange, the error was harmless. The information in the text messages at issue is cumulative. *See Leyba*, 2012-NMSC-037, ¶ 24 (stating that to analyze whether evidentiary error is harmless, courts "examine . . . whether the error was cumulative" and "other . . . evidence of guilt" (internal quotation marks and citation omitted)). There is lay opinion testimony from a police officer that places Defendant in the video of the second meeting. And, significantly, there are two statements from Stewart that identify Defendant as participating in the second meeting as a shooter. Although the State mentioned the text message exchange once in closing and once in rebuttal, it did not place special emphasis on the exchange. *Id.* (stating that courts look at "the importance of the erroneously admitted evidence in the prosecution's case" and the "emphasis placed on the error at trial" when performing harmless error analysis (internal quotation marks and citation omitted)). We do not think that there is a reasonable probability that the admission of this evidence contributed to Defendant's convictions, if in fact such admission was error. *See Tollardo*, 2012-NMSC-008, ¶ 44 (stating that even "[w]hen two cases . . . are factually analogous, with similar errors, . . . the error [may be] harmful in one case and harmless in the other.").

**{50}** We reject Defendant's argument on this issue because the text message exchange he identifies was not erroneously admitted and, if it was, the error was harmless.

**E.    The District Court Did Not Manifestly Abuse Its Discretion in Denying Defendant's Motion for a New Trial**

**{51}** Defendant argues that his motion for a new trial based on newly discovered evidence was wrongly denied. "[T]he function of passing upon motions for new trial on newly discovered evidence belongs naturally and peculiarly, although not exclusively, to the [district] court." *State v. Garcia*, 2005-NMSC-038, ¶ 7, 138 N.M. 659, 125 P.3d 638 (internal quotation marks and citation omitted). Accordingly, "we will not disturb a [district] court's exercise of discretion in denying . . . a motion for a new trial unless there is a manifest abuse of discretion." *Id.* The new evidence here is an affidavit from a witness who stated that Defendant was not part of the group that visited her in Texas as part of a broader trip to visit a person named Cheyenne Quick in Clovis, New Mexico. The witness also stated that she "remember[s] clearly that [Defendant] was not present . . . when they visited in October 2014 when the family visited Cheyenne in Clovis."

**{52}** Even putting aside the fact that the affiant does not explain how she could know that Defendant was not along for the trip to Clovis at all, Defendant has not met the requirements to receive a new trial based on newly discovered evidence. Among the six mandatory requirements is that the newly discovered evidence must not merely be impeaching or contradictory. *Id.* ¶ 8. In this case, the district court correctly determined that newly discovered evidence was impeaching or contradictory. There was other testimony indicating that Defendant was in fact in Clovis during the trip to visit his friend, Cheyenne Quick. Accordingly, the new evidence that Defendant was *not* on this trip was merely contradictory, and so a new trial is not warranted. *See id.* (explaining if even one requirement is not met then a new trial will not be granted). Thus, it was not a "manifest abuse of discretion" for the district court to deny Defendant's motion for a new trial. *See id.* ¶ 7.

## III.　CONCLUSION

**{53}** For the reasons stated, we affirm Defendant's convictions.

**{54}　IT IS SO ORDERED.**

**C. SHANNON BACON, Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**JULIE J. VARGAS, Justice**

**BRIANA H. ZAMORA, Justice**